This afternoon, and one case will be submitted on the briefs. The first case for argument today will be number 2007-1094, Tsubaki v. United States. Let's see, counsel for Tsubaki. May it please the Court, I am Brian Walsh of Barnes & Chittenden Colburn, appearing on behalf of U.S. Tsubaki. This case involves truly extraordinary delay on the part of customs, and the question of whether such delay led to the deemed liquidation of the entries in question. Mr. Walsh, let me ask you a question that really doesn't go to the merits of your legal argument, but just to set the stage for us in understanding what's at issue here. And perhaps this isn't a question that you might not be the best person to answer, but how many of these kinds of pre-1993 cases are there out there? This does strike me as an extraordinary period to go by. This is, what, almost 30 years? Do you have any idea how many there are out there? I don't know how many there are in total. I don't know how many there are in total. I know in our office we settled another case just recently with entries from the same actual anti-dumping case, Whaler Chain. Not actually from this year, but from more or less the same vintage. So that's just in our office. I don't know how many are out there in total. But the real purpose or the real question at issue in this case is whether the triggering event for the application of the 1993 statute occurred before 1993 or after 1993 in this case. The purpose of the applicable statute, 1504D, is to provide business certainty. And if it occurred before 1993, I take it that you would concede that there is retroactive application of the statute. Well, we would concede that at some earlier point the entries liquidated. No, but my point is let's assume that the triggering event was the lifting of suspension of liquidation. And that occurred before 1993. Yes, if you determine that the triggering event is the lifting of suspension, then you live. Yes. Having read American Permac, it seems to be very close to this case. You don't really distinguish, as I understand it, American Permac, except to suggest that Travenol may lead one to conclude that American Permac no longer correctly states the law. Is that a fair state characterization of your position, or do you have a distinction of American Permac on its own merits? Factually, I have to say it's very close. With regard to the statement in American Permac as to the lifting of suspension being the triggering event, there really is not much discussion in Permac involving that. And in fact, the lower courts have been treating that as dictum. So what we're here to urge upon the court is the reasoning that was used in Travenol. I appreciate the fact that American International Chemical, for example, the paradigm case in the CIT of the CIT treating the Permac triggering language as dictum. But why? The American International Chemical at the CIT said, well, we think it's dictum, period. Why would the language in the opinion of American Permac, talking about the triggering event, which is at page 1381 of 191-53, why is that dictum? Why isn't that a holding? My understanding is that because the opinion did not make reference to the actual notice provision. So that notice needs to be provided to customs of lifting of the suspension of liquidation. And in American Permac, they simply said that the lifting of the suspension of liquidation was a triggering event. But if you go back and take a look at that portion of the opinion in Permac, that statement that the lifting of the suspension of liquidation is a triggering event. Right, but for purposes of having a holding in American Permac, one party was trying to gain the benefit of the post-1993 statute, right? I'm sorry. And weren't the fact situations in Permac pretty much the same as they are here? Someone who said, look, I'm trying to get the benefit of a later statute? I think they were, yes. And so the court said, well, to decide whether or not you're asking for a retroactive effect of the later statute, which you ordinarily don't get, we have to decide what the triggering event is. And so they said, well, the triggering event was the lifting of suspension. So it would seem to me that that made it holding as opposed to dictum. Well, the lower court has referred to that holding as dictum. But what we're asking the court to do is adopt, instead, the reasoning of Travana, which also focused on determining the timing of a triggering event for a 1993 statute that was also part of the modicum. But that was for interest, right? That was for interest. I mean, that's not the same factual setting or legal setting, for that matter, that we have here, right? It's a different statute. It's a different provision. In Travana, the interest really could not be determined until liquidation, which is why I believe the court held there that liquidation was a triggering event. And we don't have the same circumstances here. Well, in Travana, they talked about liquidation and the importance of liquidation in the customs process. It's the final reckoning of duties. The customs doesn't know whether it's going to be increasing or decreasing the amount of duties assessed at the time of liquidation. And that's also the case in the anti-dumping scenario as well in our case. But the statute at issue in Travana talked about interest and the interest calculation being dependent upon liquidation. Whereas here, the statute talks about the lifting of suspension and notice thereof as the triggering events to the deemed liquidation. In this case, though, I mean, the importer in the deemed liquidation scenario will never even know if there's an issue, if there's something to be raised until customs liquidates. But in terms of the consequence to customs, if customs under the new statute doesn't act within six months, that has a consequence. Yes. And it has a consequence to customs in that the duty is deemed liquidated. Yes. Whereas there's a different set of circumstances that surrounds the statute at issue in Travana. Well, what we would argue is that both revolve around liquidation. And that in our case, there has been sufficient activity post-1993 to bring that statute to bear on our case. We have seven years of delay after 1993 before this liquidation took place. We also have the liquidation itself. Our importer did not know what the final assessment of duties would be until that took place. The customs service can change the valuation. They can change the classification. They can review the entries and even make a determination that the goods, as described, may not even be subject to anti-dumping duties. So that is the final act, which is of ultimate importance throughout the customs law, throughout Section 1514, throughout whether an importer may protest. That is the key date in terms of customs. And that's what we're asking. And we think that the Travana court appreciated that. And if you read through the decision, it talks about the importance of liquidation and how that is the final reckoning of duties. So that's what we're asking this court to recognize in this case, so that that triggering event would take place after 1983. So your argument is that it's the liquidation that is the triggering event, not the lifting of suspension or the issuance of notice. Yes. The facts aren't clear to them. The delay is not over until then. And we had, again, seven years of delay after 1993. The importer didn't know if there would ever be liquidation. But there's an independent liquidation. There's a different consequence to customs of customs failure to act under the old statute and under the new statute. Well, as we said in our briefs, we believe that customs always had the obligation to act, even under the prior statutes where the language shall was described by the court as directory. Shouldn't you be asking the court to overrule American Permac? I mean, you can't ask this panel to do it because we don't have the authority to overrule American Permac. The Court of International Trade can't overrule American Permac. They can say we don't want to follow it because we think it's dictum. But it sure doesn't look like dictum. I mean, if you take your rationale, if you will, as to what should be the correct triggering of that, which is liquidation or reliquidation, that rationale, if you hive that rationale on to American Permac, you get a different result, right? Yes. And so it would seem to me that your argument at core is that we've got a bad precedent in our law. You started off earlier by saying, well, there was no real rationale, no discussion in American Permac as to why the court selected as the triggering event the lifting of suspension. It would seem to me that Permac really is stuck right in your craw and you can't digest it. It lays across the front of your path. Your Honor, we do think that liquidation should be the triggering event. So by having a rule, at least with respect to the circumstances of this case, that the American Permac rule is your judgment, professional judgment, that that triggering event concept of being tied to the liquidation of suspension is going to be problematic in other fields, other aspects of the anti-dumping law? Is Permac a stain that's spreading? Well, I suppose in any sort of situation that could come up that would involve the application of a new statute in the customs law to the extent that it doesn't take into account the importance of liquidation. That's what I was asking. Another practical question. What I didn't understand from the record in this case is where's the money been all this time? I take it you didn't have a chunk of money on deposit, right? So this is all, you've basically been zeroed out with regard to your obligations until after the liquidation. Until after the liquidation. And when the liquidation occurs and assuming that it goes forward, you don't have to pay interest all the way back to day one, correct? Your Honor, when these duty bills came, it was before I was actually involved in the case, but what happened was that the importer had entries that had been out there since 1979 and suddenly received additional duty bills in 2007. So where I'm trying to go with that, obviously, is this really something that hurts you in the sense that you're subject to interest for a period that nothing was going on in the agency and you're having to pay accumulating interest? Or are you getting a free ride for that entire period so that all it is is a potential contingent liability sitting on your books but no money out of your pocket? This may have been in the pre-interest era before the interest statute was put into place, but again, the issue is one of business certainty. I understand, but to me, perhaps to most businesses, if it's cash on the barrel head, it matters more than a little business uncertainty. If you had the choice between being out a quarter of a million dollars, which is sitting in the government's coffer, versus having some uncertainty as to whether you may ultimately have to pay a quarter of a million dollars, most people take the second. Well, they did have to pay the money. Ultimately. Out of funds for 2000, 2001. Right, but if there was no interest, then they were really only paying 20 cents on the dollar of what they would have paid if they'd had to pay back on day one. Because the money isn't worth what it was. And your client had the use of the money all during that time. In fact, the use of the money paid for what you had to pay in the end. It was free. Excuse me? Well, if during a long period of time, you don't have to pay any money, and then you finally pay the money, but you don't have to pay any interest for the time period preceding, that if you had had to pay the money earlier, you would have been out of pocket the money. If I have a million dollars that I'm able to enjoy the use of for 10 years, and then I have to pay a million dollars, I should have been able to make a million dollars during the 10 years off the million, so it would be free. In the business. Yes, but if you take a look at the way this happened, the period of review was started in 79. The final results didn't come out until 86, so they had no idea in that entire time that there would be any additional amount owed at all. I mean, they were arguing that there wouldn't be for that entire time. And then, everything went into hold. I mean, the client didn't know if they'd ever hear anything again. So, when these came up, it was the sort of situation where, you know, what is this all about? Why do we owe this money? Well, what I'm really hearing you say is at the very bottom line, this ought to be an instance in which retroactive application of the statute is permitted. In fairness. Isn't that what you're really saying? Well, in fairness, yes, I mean, it could, but that's not our argument. Our argument is that we don't have to go to retroactive application of the statute. Instead, we should focus on what the event was after 1993 that was the trigger. Why don't we restore, we'll give you some rebuttal time, a couple minutes of rebuttal time. We've asked you a lot of questions, and we'll hear from Ms. Williams. Thank you. May it please the court, the government would agree that in order to fine for Tsubaki, you would need to overturn the American Permit. Ms. Williams, what is the explanation for this truly extraordinary period here? I mean, this case has been pending for so long, it makes Jarndyce and Jarndyce look like it was on the rocket docket. I mean, this is crazy. Yes, it was an extreme amount of time. Well, A, what's the reason? B, are there more of these little surprises waiting for us? I don't know the answer to that. I don't know whether there's any more out there. Does the agency know? I mean, is this a situation where there's a large, somebody's inbox is sitting there with a whole bunch of stuff in it from 1979? I have no idea. I imagine the agency would know. But I think that's why 1504 got amended, is this exact concern that there was a delay and we want to deal with it quickly. However, when they amended it, they didn't make it retroactive, so I think Congress is telling us we don't like the delay, it's not appropriate. But this is going to stop in 1993, and I think that's the problem that Tsubaki has here. But to answer your question, I do not know how many more cases out there. Is that something you could find out by consulting the agency general counsel? Yes, I could, Your Honor. Is agency counsel here today, by the way? No, they're not. I can tell you that I'm not aware of any more pending before my office that deals with this issue. I think that would be helpful to us to have some sense of what's out there if that's, I mean, if Mr. Wallace does not mind, something that's not strictly within the scope of the record. No, that's fine. Okay, I will definitely check on that, Your Honor. But nevertheless, as I mentioned, this statute was not intended to be retroactive. And I think Tsubaki's argument really loses sight of Langreth, which tells us how you know something's retroactive. The Supreme Court in that case said— I don't think Mr. Walsh is tackling the retroactivity issue. If I understand his argument correctly, it's more going to the trigger. I think he says it's not retroactive because he says you look at triggers, you start searching after 1993. Right. The problem is Langreth doesn't say that. Langreth says the trigger is the first completed act which has a new legal consequence. It doesn't say you start searching for subsequent acts that may have a legal consequence. It tells you you look for the first completed conduct. The problem is here, as Judge Lynn mentioned, when you actually look at the statute, it's quite clear that the first legal acts attached to removal of suspension, notice two customs of the removal. So Langreth is very on point here. It tells you exactly the type of conduct you look at. When you look at 1504, you can tell what those acts are, and they occur before 1993. While liquidation might give the plaintiff's notice of the degree of its cause of action, if you will, it tells the plaintiff the difference in duty, the liquidation is not the completed act which has a new legal consequence. You're saying then that even if the lifting of suspension had occurred after, say, in 1995, that even under those circumstances where that is what you would say would be the triggering event, there would be, you would still apply the pre-93 statute? No. I would say we look to American Permit Act, which focuses directly on Langreth's language, that you look to the triggering act. Okay, I thought you were saying that you'd go all the way back to the first event that gave rise to initial liability, which would be the importation. Langreth tells us that's the triggering act. Now, are you saying the importation or the removal of suspension is the act which tells us... Removal of suspension. But that's not the thing that sets the original liability. But Langreth says you don't necessarily look, and I'll quote it, just because a statute operates with regard to prior conduct doesn't mean that triggers the retroactivity. You look at the prior conduct that's completed that has a new legal consequence, and in that case the importation while prior conduct has no legal consequence attached to it, so that wouldn't be your trigger. But I think this court in American Permit Act correctly said where does the legal consequence attach, and it attaches at the removal of suspension. Does it attach at the removal of suspension or does it attach after the notice, after the receipt of notice? You're asking did the trial court or did the CIT get it more correct in American International? An interesting question. I'm going to preface this with the Federal Circuit's decision is governing law, so if you wanted to find the trial court was correct, I believe you would need to have an en banc hearing and overturn it. I don't necessarily, I don't think it was dicta going to what you said earlier. Clearly that was the holding of American Permit Act. I think looking at the statute as a whole it is a very reasonable assumption it ought to be the law that the removal is the triggering event because that is what starts this series of events that leads to deliquidation. And I wanted to emphasize the role of this case in the bigger world because there's a lot of litigation out there that's international trading and fugitives that analyze when the six months starts. Does it start with an email? Does it start with liquidation instructions? All of those cases demonstrate there's a legal consequence from what happens when there's notice to customs. Notice to customs you say? Yes, those focus on the notice. Right, okay. So what I'm trying to say is if you're going to find, to find that liquidation is the first event that has a legal consequence would really in effect find international trading and fugitives meaningless because those cases analyze how you define deemed liquidation and these are, if you abide Tsubaki's argument, it would mean those cases inherently have no meaning because there'd be no legal consequence attached to what they're finding. Let me make sure I understand exactly what your argument is here with respect to the trigger. Let's assume that lifting a suspension and notice are two different events that occur at different times. Which is it that triggers in your view? American Permit Act lifting. Even if there's no notice at that time? Yes, because the reason is that is the state of the law as we sit here. It's quite clear in American Permit Act. Is there, and is there a... Was notice given in American Permit Act to customs? Yes. Was there timely notice given to customs in American Permit Act of the lifting of suspension? The way it worked in American Permit Act, suspension was removed in August of 89. Commerce instructed customs to liquidate the entries in October of 89. So a couple of months. Well, but presumably you could have a third date, which is the advising customs of the lifting of suspension, right? Yes, but in American Permit Act what I'm saying is that advice was incorporated in the instructions from commerce to customs. Right, although the opinion doesn't say that. No, it does not. Right, okay. But you could have theoretically removal of the suspension, then you could have... Notice of removal of suspension, and then instructions. And that's really... And you would say it's the first date, not the second, and surely not the third, you would argue. Absolutely, and certainly not liquidated. And is there a firm statutory basis on which you, other than the fact that PERMAX says this, is there a firm statutory basis on which you would point us to as the ground for saying that it is the removal as opposed to the notice of removal? The text of 1504. Yeah, what's the language? I don't have it in front of me at the moment. The language is... Is it in the text? It says, when suspension is removed, customs shall liquidate the entry, I'm just summarizing, within six months after receiving notice. This is the 93 Act. The 93 is what I just read. But from the pre-93 Act, which we're applying here, it has similar language? Oh, no, it does not. The pre-93 Act is quite different. Okay, all right. So you're saying that in order to apply the 93 Act, you have to look to the trigger, and the trigger, therefore, is in the 93 Act by virtue of the reference to the six months. Exactly right. Thank you, Your Honor. Thank you. No, thank you. I misapprehended what you were saying. All right. If there's any other questions... Let me just ask you one question that has to do with a point that was raised and was a brief reference to it before Mr. Walsh sat down. His argument that the administrative message that was sent from Commerce to Customs in June 2000 should constitute the trigger. I think he probably wants to talk a little bit about that in his rebuttal, and I'm not certain he raised it directly in his primary argument, so I want you to raise it so he can rebut it. Yes. Clearly... If you don't mind. Thank you for raising that. Clearly, we do not feel that that email is the act that triggers the application of 1504. As international... Well, tell us a little bit about what the email did. Why was it sent? What did it do? It was similar, as far as I can tell, to those sent in international trading, where Commerce was trying to determine whether Customs had any outstanding entries. They were trying to kind of clean house. International trading has considered a similar email when nothing has been communicated prior to Customs to be noticed that a suspension was removed. But based on the court decisions in the prior cases, I believe it's clear the intent really was to be sort of a housekeeping email. Well, if you're saying, I gather, in response to his argument, so what? If American Permit Act is correct, we clearly have a lifting suspension here before 1993, and so that was a statutory triggering act that leads to the analysis on the retroactivity. So what if there was a later communication that told Customs, you know, start liquidating? And I would say even if American Permit Act could take that out of the equation, even if you looked at the text of 1504, clearly a second email isn't what triggers that statute, and that's supported by international trading in Fujitsu, where there were second emails, and in analyzing when the sixth month starts, the court was quite clear in saying those are irrelevant in that arena. So it's really the parallel reasoning here. A second email can't really change something, and it certainly doesn't change what triggers the statute. Was there any subsequent history in American international chemical? No. I know the case was not appealed. I do not know. It was one of the things I intended to look up and forgot to, but I know it was not appealed. Thank you. Thank you. Mr. Walsh. Thank you. Ms. Williams talked a bit about Landgraf, and the language I believe she used was that the first completed conduct which has a consequence should be the trigger under that case. In this case, the first completed act that actually had a consequence was after 1993. If we take a look back at the issuance of the final results, which were in December of 86 and May of 87, that was the Commerce Department saying what the anti-dumping duty margins would be applied in these periods, but nothing happened. No one heeded that. Liquidation instructions didn't even come out until September 18th of 2000, so it's like those final results went into a vacuum. They didn't have consequence in any practical sense of the word in terms of anyone in the agency actually taking action or working on them. The letter, the e-mail that was raised— So it's your argument is really from the perspective of your client the first act of any legal consequence is liquidation or reliquidation. It's the most significant act, certainly. But it's the act of—it says pay or you didn't have to pay. It's the go, no-go. Yes. It's like the effective date of a statute, if you will. Exactly. Isn't that your analogy? Yes. And you're saying the lifting of suspension and the notice to customs that suspension is going to be lifted is like enacting a statute saying customs, you now have authority to liquidate, right? Yes. But the statute doesn't have any consequences, but it says until the effective date. Yes. And the effective date is the date selected in the analogy here, not by statute, but by customs when it actually liquidates or reliquidates. That's right. That's the rationale of your in-bank petition for overruled American Permit, right? That's what's wrong with American Permit. Yes. It doesn't focus on the first act with legal consequences to the party in question. Right. Right? Yes. But we are bound by American Permit even if it's wrong, aren't we? Well, again, I'll just say that we believe that the correct reasoning is what was also used by this court in Trevino. Thank you. Thank you very much, Mr. Walsh. I think whether interest accrues on these funds that are subject to the as yet unliquidated, but liquidation or suspension has been lifted during the period between whatever it was, 1987. 30 days? I think, yeah. This isn't something that we need tomorrow. If you think... Before Easter. I didn't get an answer to that. Fairly promptly? Yes. All right. Well, we won't impose any particular period. That will be fine. That will be fine. And if there's anything, I assume that there won't be anything that Mr. Walsh would take exception to, but if there is, you have a right of reply. Thank you, Your Honor. Can we thank both counsel? Thank you. The case is submitted.